## ÆOLIAN CO. v. SIMPSON-CRAWFORD CO.

(Circuit Court, S. D. New York. July 16, 1909.)

PATENTS (§ 328*)—INFRINGEMENT—PIANO PLAYER.

The Wright patent, No. 596,730, for a piano player, construed, and *held* not infringed.

[Ed. Note.— For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit by the Æolian Company against the Simpson-Crawford Company for infringement of patent. On final hearing. Bill dismissed.

J. Edgar Bull, for complainant.

James Whittemore and Edward Rector, for defendant.

PLATT, District Judge. This is a patent suit for infringement of claims 5 and 6 of Wright patent, No. 596,730. They are as follows, viz.:

Claim 5: "In a musical instrument, the combination of pneumatically-actuated operating devices, a main shut-off valve, a spring-pressed, auxiliary bellows or pneumatic, a pressure-regulating valve controlled thereby, and an independent controlling valve, substantially as described."

Claim 6: "In a musical instrument, the combination of pneumatically-actuated operating devices, a main shut-off valve, 37, for cutting off the wind-pressure when the instrument is not in use or the paper is being re-rolled, and controlling valves, 42 and 43, one of said controlling valves being connected to and actuated by a spring-pressed, auxiliary bellows, 46, and the other of said controlling valves being capable of an independent action to provide a direct connection between the pneumatic devices and main bellows when desired, substantially as described."

The defense is noninfringement.

We will first look for a moment at the patent in suit. We are at once struck with the fact that the patentee makes a general résumé of the prior art before specifying how he thinks he has improved it. He says that his improvement applies to automatic musical instruments of the *class* controlled by rolls of perforated paper, and that he seeks to provide compact, simple, and efficient pneumatic-actuating devices for pianos or *similar instruments*. (Italics here and elsewhere are my own.) His very words show that he was delving in an art with which he was familiar, and that he aimed at making old things better; and had no notion that he was presenting a startling or epoch-making invention. Long afterwards the exigencies of the situation stimulated the expert to invest the patentee with an expanse of thought which is hidden from such intelligence as the writer can bring to bear upon the matter.

It is obvious that the complainant's only hope of success depends upon its ability to persuade the courts into a very broad construction of the patent. It is earnestly contended that Wright was the first person to present means by which the performer on an automatic *piano* could at his pleasure and instantly, accent the music which the piano was interpreting. The patented device is insistently and repeatedly called the "Wright regulator," and one of its elements is called "an

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

automatic pressure regulator." That element is to be found in the cuckoo bellows, which it is admitted had been used for the same purpose in organs, but that here for the first time it was applied to the keys of an automatic piano.

In the Parker patent, 560,303, a similar device is used in a piano to regulate the wind pressure in the wind chest in the passage which leads to the motor devices for winding the music sheet. It is doubtful if it would show invention to transfer the Parker device to the passage which leads to the piano keys. It befogs thought to constantly harp upon such expressions as "striker pneumatics," "primary pneumatics," "secondary pneumatics," and "pneumatically-operated actuating devices." To my mind, it is unimportant, when one is regulating wind pressure, whether he cares for it in the passage which leads to piano keys, or to pipes, or to reeds, or to a rewinding motor. In each case the same wind pressure is regulated, and a hand-controlled valve is brought into the combination, which will let in, on the instant, an abundance of extra pressure, and in like manner can instantly prevent the introduction of such extra pressure. And so, for my part, I can think no good of the patent, if we are to look at it in a general way as a pressure-regulating device and nothing more.

It would also seem that lugging in the "shut-off valve, 37," is adding an element which has no mechanical connection or correlation with the regulating device of which so much is made. There is no connection between them, no common purpose to be subserved, no coaction, no community of interest. Each works out its own sweet will, and to attempt to unite them is aggregation, not combination, if we are to give the patent the construction which the complainant desires.

Hurrying along past these and other serious objections to acquiescing in complainant's views, we come to the "auxiliary reservoir" proposition, an answer to which seems, beyond peradventure, to be decisive of the issues herein. Let us settle what the element is which in claim 5 is called "a spring-pressed auxiliary bellows or pneumatic" and in claim 6 "a spring-pressed auxiliary bellows, 46," which is connected to and actuates a controlling valve (No. 43 of claim 6, and shown in Fig. 7, and called in claim 5 "the pressure-regulating valve"). We find the device in Fig. 4, viz., the cuckoo bellows, No. 46. The patentee tells about it in that part of his specifications beginning at line 117 on page 2 and ending at line 18 on page 3, viz.:

"The arrangement of controlling valves which I preferably employ is most clearly illustrated in Figs. 4 and 7. As shown, 35 indicates a passage which may be connected to a bellows or any ordinary air-pumping device and which opens into a valve chamber, 36. Mounted in the valve chamber, 36, is a main shut-off valve, 37, which may be actuated from a rock shaft by means of a link, 38. When the instrument is not in use, or when the paper is being rerolled, the main shut-off valve, 37, will be closed, which will prevent the air being drawn from the main vacuum chamber, 15, and the instrument from playing. Opening from the valve chamber, 36, are ports, 40 and 41. The port, 40, is controlled by a slide valve, 42, which may be actuated by a link, 44. When the slide valve, 42, is opened, a direct connection between the main vacuum chamber and the bellows may be provided, and this valve will be opened only when it is desired to produce unusually loud or brilliant effects. Co-operating with the port, 41, is a regulating slide valve, 43, which is connected by a link, 45, to the upper arm of a bellows or pneumatic, 46. The

bellows, 46, is normally distended or drawn upward by means of a coiled spring, 47. By means of this construction it will be seen that the *spring pressed bellows, 46,* will act as a regulating device to control the suction or pressure exerted by the main bellows, *and will also form a reservoir or reinforcing device for producing chords or notes requiring an unusual volume of wind.*"

Saying that the bellows are auxiliary shows (and the patentee admits this in the last underscored words) that the bellows themselves are intended to do something more than to act as a regulating device. The scale to which the bellows are drawn shows them much too large for that single purpose. Earlier in the specifications he had said that before his application the connection between the keys and the pumping bellows had been direct. He had found that such an arrangement did not work, because it was impossible to maintain an exactly constant air pressure by the bellows, which would naturally vary as the power applied to the bellows varied. Different chords or notes required different amounts of wind, and a direct connection did not provide for any reserved capacity of wind. Let me quote from page 2, line 8 et seq.:

"*To overcome these objections* I have combined pneumatic playing devices constructed according to my invention with a controlling valve, which is connected to and actuated from a *supplemental* spring-pressed bellows or pneumatic. By means of this construction a uniform air pressure will be maintained, and the spring-pressed bellows or pneumatic will *form* a supplemental reservoir, *which* will act automatically to supply the wind pressure required to produce heavy chords or notes."

Now, after Wright had shown in his drawings a bellows capable of acting as a supplemental reservoir, and had talked about it as such in his specifications, and had taken pains to emphasize it as "auxiliary" in his claims, it would strike the general observer that he meant what he said, and expected the bellows itself to act as a reinforcing device, and that his words aptly described his thought.

The complainant insists that he neither said nor meant any such thing. It would seem, though, that its expert thought so when the prima facie case was being made out. Defendant then showed that the little cuckoo bellows of the alleged infringement was incapable of holding enough air in reserve to amount to anything. Complainant's expert was therefore compelled to find in the patent in suit a storage reservoir somewhere outside which the cuckoo bellows could *"form."* He thought he found it in the air passage leading from the pumping bellows to the point where, by closing valve No. 43, the cuckoo bellows shut off any further flow of air in that direction. I cannot believe that the patentee had even a suspicion of such an idea when he was talking about his cuckoo bellows as auxiliary, and as forming a reinforcing *device* for *furnishing* an extra amount of wind when needed. He certainly capped the climax by neglecting to illustrate in his drawings a complete presentation of the storage reservoir which the expert has lately discovered.

We cannot go on forever. It all comes down to this: If the cuckoo bellows of the patent is, in and of itself, a helper, by storing up within itself air against need, the defendant does not infringe. If it is simply a regulating bellows, not containing within itself the function of stor-

ing up air against need, it is not novel. I am so thoroughly convinced of the force of the first proposition that I hope to be excused from extended discussion of the second one, upon which my own views are equally pronounced, as must be evident from sporadic outbursts appearing here and there throughout this memorandum.

Let the bill be dismissed.